**FURLONG AND KRASNY**
Mountain View Office Park
820 Bear Tavern Road/Suite 304
West Trenton, New Jersey 08628
(609) 882-0288
Attorneys for Plaintiffs

RECEIVED

APR 2 1 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WILLIAM H. MOORE and<br>MARYANN HYSLER,<br><br>Plaintiffs,<br><br>vs.<br><br>DEVON BROWN, Department<br>of Corrections Commissioner,<br>JAMES DAVY, Department<br>of Human Services Commissioner<br>ALAN G. KAUFMAN, Division of Mental<br>Health Services Director,<br>GRACE ROGERS, Administrator<br>of Adult Diagnostic Treatment<br>Center, Northern Regional Unit and Annex,<br>GLEN FERGUSON, Clinical Director for<br>the Northern Regional Unit,<br>MERRILL MAIN, Director of Psychology<br>for the Northern Regional Unit,<br>and JOHN DOES 1-30, JANE DOES 1-30<br>Fictitious Names,<br><br>Defendants. | Civil Action No:<br><br>05-2179(JCL)<br><br>COMPLAINT |

Plaintiffs, William H. Moore and Maryann Hysler, with a principle residence at Two North

Oyster Creek Road, Leeds Point, New Jersey by way of Complaint against the defendants, say:

O:\Moore,Wm\1983\complaint.wpd

PRELIMINARY STATEMENT

1.    This is an action in which plaintiffs seek to have this Court declare unlawful and enjoin certain policies and practices of the defendants, which plaintiffs allege violate plaintiff Moore's right to safe, non-punitive conditions of confinement, adequate treatment and free exercise of religion and both plaintiffs' fundamental right to marry.

2.    This action arises under 42 U.S.C. §§ 1983 and 1988; the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc; and the First and Fourteenth Amendments to the United States Constitution.

JURISDICTION AND VENUE

3.    Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1331 which authorizes original jurisdiction on the district court of all civil actions arising under the Constitution, laws or treaties of the United States.

4.    Jurisdiction is also conferred upon this court pursuant to 28 U.S.C. § 1343(a)(4) which grants original jurisdiction to the district court of any action to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

5.    The United States District Court for the District of New Jersey is the judicial district where the events or omissions giving rise to plaintiffs' claims occurred, and also is the district in which all the named defendants reside, and/or where they may be served with process, and therefore is the proper venue for this action pursuant to 28 U.S.C. § 1391(b).

PARTIES

6.    Plaintiff William Moore was a resident of Brigantine, New Jersey prior to his current residence stemming from an order of involuntary civil commitment at the Northern Regional Unit, Kearney, New Jersey at all times relevant hereto.

7.    Plaintiff, Maryann Hysler continues to reside in Leeds Point, New Jersey, and she is the

O:\Moore,Wm\1983\complaint.wpd                    2

fiancee of plaintiff William Moore.

8.  Defendant, Devon Brown is the Commissioner of the Department of Corrections (DOC). The DOC is a department of the executive branch of the State of New Jersey as set forth in N.J.S.A. 30:1B-2. As Commissioner, Brown is the head and chief executive officer of the DOC pursuant to N.J.S.A. 30:1B-4. His duties are outlined in N.J.S.A. 30:1B-6 and include determining all matters of policy and regulating the administration of the institutions or noninstitutional agencies within his jurisdiction. Under N.J.S.A. 30:4-27.34(a), he also is responsible for the operation of any facility designated for the custody, care and treatment of sexually violent predators, and shall provide or arrange for the custodial care of persons involuntarily committed pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:27.24 et seq. Under N.J.S.A. 30:4-27.34(d), Brown along with the Commissioner of Human Services, in consultation with the Attorney General, is responsible for establishing the rights and rules of conduct applicable to persons committed under the SVPA.

9.  Defendant, James Davy is the Commissioner of the Department of Human Services (DHS). DHS is a department of the executive branch of the State of New Jersey as set forth in N.J.S.A. 30:1-2. This statute also names the Commissioner the head of the department and its principal executive officer. His duties are outlined in N.J.S.A. 30:1-12 and include the power to determine all matters of policy and the power to regulate the administration of the institutions or noninstitutional agencies within his jurisdiction. Under N.J.S.A. 30:4-27.34(d), Davy along with the Commissioner of Corrections, in consultation with the Attorney General, is responsible for establishing the rights and rules of conduct applicable to persons committed under the SVPA.

10. Defendant, Alan G. Kaufman is the Director of the Division of Mental Health Services (DMHS). The DMHS is a division of the DHS. As Director, Kaufman is responsible for the supervision of the DMHS pursuant to N.J.S.A. 30:1-9. He is also responsible for arranging for treatment for persons involuntarily committed under the SVPA pursuant to N.J.S.A. 30:4-27.34(b).

11. Defendant, Grace Rogers is the Administrator of the Northern Regional Unit and the Annex, the detention sites for involuntarily committed persons under the SVPA.

12. Defendant Glen Ferguson is the Clinical Director for the Northern Regional Unit and as such is responsible for all clinical protocols, evaluations, and maintenance of records regarding the clinical status of committees.

13. Defendant Merrill Main is the Director of Psychology for the Northern Regional Unit, and as such is responsible for supervision of staff psychologists, adherence to professional standards, peer review, and related activities.

14. Defendants, John Does 1-10 and Jane Does 1-10, are fictitious names for DOC employees whose duties include classification, custody, and special operations staff, as well as any duty defined by statute to be assigned to the Department of Corrections, including responsibility for maintenance and security of the facility and grounds of the Northern Regional Unit.

15. Defendants, John Does 11-20 and Jane Does 11-20, are fictitious names for DMHS, DHS or contract employees who are members of the "treatment team" defined in N.J.S.A. 30:4-27.26 as persons who provide treatment, supervision or other services at the facility where

plaintiff Moore is detained as a sexually violent predator.

16. Defendants, John Docs 21-30 and Jane Docs 21-30 are fictitious names for DOC and DHS representatives who are members of the interagency oversight board responsible for the coordination of the policies and procedures at the Northern Regional Unit and Annex pursuant to N.J.S.A. 30:4-27.34(c).

17. All defendants are being sued in their official capacity only.

## RELEVANT STATUTORY SCHEME

18. The SVPA, N.J.S.A. 30:4-27.24 et seq, allows for the involuntary civil commitment of a person found to be a sexually violent predator.

19. N.J.S.A. 30:4-27.26 defines a sexually violent predator as

a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

19. N.J.S.A. 30:4-27.27(a)(1) requires notice to the Attorney General of a person who might meet the criteria of a sexually violent predator prior to his or her release from prison.

20. On the Attorney General's motion and a finding of probable cause, the court may enter a temporary commitment order under N.J.S.A. 30:4-27.28(c) and (g).

21. Under N.J.S.A. 30:4-27.32(a), a commitment hearing is held before a judge, not jury, to determine whether there is clear and convincing evidence that the person is a sexually violent predator.

22. N.J.S.A. 30:4-27.34 provides that DOC, DHS and DMHS are responsible for the custody and treatment of the committee.

23. N.J.S.A. 30:4-27.34(d) provides for regulations regarding the rights and rules of conduct applicable to persons committed under the SVPA. No regulations can be found in the New Jersey Administrative code. Subsection (d) also provides that the regulations must take into consideration the rights of committed persons delineated in N.J.S.A. 30:4-24.2.

24. N.J.S.A. 30:4-24.2 prohibits a patient from being violated of his civil rights solely by reason of his commitment status. The statute also sets forth specific rights. The lists includes, but is not limited to, the right to be free from physical restraint and isolation, to be free from corporal punishment, to privacy and dignity, to the least restrictive conditions necessary to achieve the purposes of treatment, to wear his own clothes, to see visitors each day, to have reasonable access to and use of telephones, both to make and receive confidential calls, to have ready access to letter writing materials, including stamps, and to mail and receive unopened correspondence, to regular physical exercise several times a week, to be outdoors in a reasonably-sized outdoor area at regular and frequent intervals, to practice the religion of his choice or abstain from religious practices, and to receive prompt and adequate medical treatment for any physical ailment.

25. Persons involuntarily committed under the SVPA are to be given review hearings annually to determine the need for continued commitment under N.J.S.A. 30:4-27.35.

26. Notwithstanding the provision for annual review, N.J.S.A. 30:4-27.36 allows the treatment team to recommend release from involuntary commitment at any time if deemed appropriate.

## FACTUAL BACKGROUND

27. In May, 1999, plaintiff Moore was nearing the completion of an 8-year prison sentence, when the State sought his commitment pursuant to traditional civil commitment law, and as result thereof, he was transferred upon completion of his prison sentence to the Ann Klein Forensic Center in Trenton, New Jersey.

28. The Ann Klein Forensic Center is the State of New Jersey's maximum security forensic medical institution, built within the last ten years, surrounded by an inward curved chain link fence, tree-lined park areas, and supervised by medical personnel, including medical security officers.

29. Thereafter, a New Jersey court determined plaintiff did not meet the strictest criteria for dangerousness to self, others, or property and ordered plaintiff transferred to a less-restrictive facility in Ancora, New Jersey.

30. Plaintiff remained in Ancora for the balance of 1999 without incident or change of circumstance. Ancora is a park-like facility similar to Ann Klein, except that residents are permitted to walk between buildings unescorted to meals, therapy sessions, and recreation.

31. In January, 2000, the Attorney General of New Jersey sought plaintiff's civil commitment under the SVPA.

32. On January 12, 2000, an Order for Temporary Civil Commitment was entered, and plaintiff Moore was transferred to his current living quarters, alternately referred to as the "Northern Regional Unit" (NRU), or the "Special Treatment Unit," (STU), in Kearny, New Jersey.

33. The hearing on the State's petition for commitment was conducted on July 10, 2000, after which the New Jersey Superior Court, Law Division entered judgment committing plaintiff Moore to the NRU. At that time, the court scheduled an annual review hearing for July 9, 2001.

34. Following the July 9, 2001 hearing, the court ruled that plaintiff Moore's commitment pursuant to the SVPA would continue, with the next annual review hearing scheduled for August 16, 2002. The court entered its judgment on August 24, 2001.

35. On October 3, 2001, plaintiff Moore filed a notice of appeal with the New Jersey Superior Court, Appellate Division.

36. On July 11, 2002, while plaintiff Moore's appeal was awaiting oral argument, the New Jersey Supreme Court issued its decision in In re Commitment of W.Z., 173 N.J. 109 (2002), which announced a more stringent standard for commitment under the SVPA.

37. Plaintiff Moore's annual review hearing scheduled for August 2002 was postponed pending the outcome of his appeal.

38. On January 2, 2003, the Appellate Division remanded the case to the trial court for a new hearing in light of the Supreme Court's decision in W.Z.

39. On remand, the trial court considered the matter on the prior record and without further testimony. On March 12, 2003, the court entered an order adhering to its prior decision in favor of commitment.

40. On April 24, 2003, plaintiff Moore filed a notice of appeal from the March 12, 2003 order.

41. On April 5, 2004, the Appellate Division affirmed the trial court's order of continued commitment.

42. On May 16, 2004, plaintiff Moore filed a petition for certification with the New Jersey Supreme Court.

43. On June 30, 2004, the New Jersey Supreme Court denied the petition.

44. Since January, 2000 and all times relevant herein, plaintiff Moore has been committed to the NRU.

## COUNT I
### Unsafe Conditions of Confinement

45. Variously referred to as the "Special Treatment Unit" and the "Northern Regional Unit," the buildings housing plaintiff Moore and hundreds of others are unsafe and grossly inadequate. This complex was formerly the site of the Hudson County Jail, one of three county facilities closed more than a decade ago, owing to a plethora of unsafe and unsanitary conditions. The passage of time and application of multiple coats of paint have not improved the quality of the housing or support systems.

46. The complex suffers from substandard heating, ventilation, and (non-existent) air conditioning. Notwithstanding building inspector's oversight, the HVAC systems are well below current building code, as set forth below.

47. The jail also fails to conform with fire code specifications, both in terms of the operation or non-operation of alarm and sprinkler systems, and a lack of evacuation protocol, but also in terms of the operation of doors and windows in the event of a fire, again as more fully described below.

48. The jail's plumbing systems are corroded and below construction code, leading to persistent flooding, leaching of waste water into certain cells, possible contamination of

O:\Moore,Wm\1983\complaint.wpd

9

drinking water, and ultimately formation of mold, all as more fully set forth below.

49.    Electrical systems are correspondingly compromised by the leaking water, heating deficits, and related code violations, as more fully set forth below.

50.    The declining structural integrity of the complex contributes to or results from the various system deficiencies described hereafter, including leaking roofs, unsealed windows, and mold-infested walls and floors.

51.    In addition to the system failures and structural deficiencies, plaintiff Moore has had to contend with other practices and policies of defendants, which have dramatically increased risk of infection and contamination, as more fully described below.

52.    To begin with, the heating system at the NRU consists of an outside air pump without a working backup system.  As a result, plaintiff Moore's living area is not heated when the outside temperature dips below 32 degrees.

53.    The heating system has failed to work properly for the last four winters.

54.    Plaintiffs Moore and Hysler have repeatedly brought this problem to the attention of DOC officials, the Governor and legislators, among others,  in an effort to obtain administrative relief.  Their efforts during the previous two winters include, but are not limited to, the following:

    a.    On January 14, 2004, plaintiff Hysler telephoned the Board of Health.

    b.    On January 16, 2004, plaintiff Hysler telephoned the Hudson County Board of Freeholders.

    c.    On January 19, 2004, plaintiff Hysler wrote to Governor McGreevey.

    d.    On January 23, 2004, and January 26, 2005, plaintiff Hysler telephoned

defendant Brown's office.

e.    On April 5, 2004, plaintiff Hysler wrote to defendant Brown.

f.    On November 21, 2004, plaintiff Moore wrote to William Plantier, Director of the DOC's Division of Operations.

g.    On November 30, 2004, plaintiff Hysler wrote to Acting Governor Codey.

h.    This past winter plaintiff Moore also wrote to New Jersey Senator Joseph Vitale.

i.    On January 25, 2005, Senator Vitale forwarded plaintiff Moore's correspondence to New Jersey Senator Nicholas Sacco, Mr. Moore's local representative.

55.    Despite plaintiffs' numerous attempts to have this unsafe condition remedied, the heating system continues to be grossly inadequate, resulting in the following:

a.    Ice has formed on the inside cell walls where committees sleep.   In January 2004, DOC and DHS officials toured the facilities and observed the ice on the cell walls.

b.    Ice has also formed on the floors of the facility, including in January 2004 and January 2005.

c.    The facility has cancelled therapy sessions due to the lack of heat.

d.    Plaintiff Moore has been forced to wear thermal undergarments, outer coat and hat while indoors.

56.    In addition to the lack of heat, the facility floods from rain water and broken pipes.  There are also numerous leaks from pipes carrying waste water.

O:\Moore,Wm\1983\complaint.wpd                    11

57.  This problem has existed since at least 2001 and continues to the present. Some examples of flooding and leaking pipes include:

a.  During a storm on December 8, 2001, water came into the facility through the walls, windows and doors. The following morning, the day room in 1 North was flooded. A plugged in microwave was submerged in water.

b.  On March 23, 2002, following a rain storm, water had to be removed from the floors on five separate occasions. One resident fell in the hallway, injuring his back.

c.  On diverse dates, including August 4, 2003 to August 11, 2003 and November 23, 2004, the day room flooded from rain fall.

d.  On diverse dates, including September 8, 2004 and November 23, 2004, water leaked through a light fixture on 1 North.

e.  Whenever it rains, water leaks from cell window onto plaintiff Moore's bed which is bolted to the cell floor.

f.  When residents on the second floor flush their toilets, water leaks into the first floor cells through the water cabinets. The water makes its way to the cell floor and then into the hallway.

58.  As with the heating problem, plaintiffs have brought this issue to the attention of various state and local officials. The following is representative of plaintiffs' numerous efforts:

a.  On September 9, 2002, plaintiff Hysler wrote to Governor McGreevy.

b.  On January 19, 2004, plaintiff Hysler wrote to Governor McGreevy,

c.  On November 30, 2004, plaintiff Hysler wrote to Acting Governor Codey.

59. Plaintiffs' efforts thus far have been in vain. Despite officials' claim that no problem exists or it has been addressed, incidents of flooding and leaking water persist.

60. As a result of the excessive moisture, the facility is infested with black mold. Areas of infestation include the showers, ceiling, common areas, utility closets and the ventilation system.

61. The large concentration of mold creates a health risk to plaintiff Moore. Since his commitment, he has experienced an unexplained, recurrent skin rash and cysts.

62. The fire detection system at the NRU does not function properly. A four alarm fire system sounds at all hours of the day and night for as long as five minutes per episode. The deafening noise is disruptive and anxiety producing. These alarms sound although there is neither a fire nor a drill being conducted.

63. The fire alarms have malfunctioned since at least December 2001. In 2003, the fire alarms sounded 70 times. In 2004, the alarms sounded 85 times. As of April 20, 2005, this year's false fire alarm count reached 46. The January-March total represents the most alarms to date in a three-month period.

64. The facility has an electronic security door system designed to automatically unlock the cell doors when the fire alarms are activated. This system does not work. In the event of a fire, committees will be trapped in their cells until each door is opened manually. The electronic security door system has not worked since at least December 2001.

65. In early March 2004, during one of four actual fire drills in a four year, seven month period, one committee's cell could not be unlocked. It took DOC staff two hours to open the door.

66. Plaintiffs brought this problem to the attention of officials on numerous occasions. The previously referenced letters also addressed the non-working fire alarm and security door systems.

67. On February 23, 2004, defendant Brown responded to one of plaintiff Hysler's letters. Despite overwhelming evidence that the fire alarm system was not functioning properly, defendant Brown simply dismissed plaintiff's concerns. He wrote, "[t]he fire alarm system is in working order."

68. In plaintiff Hysler's April 5, 2004 letter to defendant Brown, she provided specific information regarding the number of false fire alarms in the prior two years, the malfunctioning electronic door system and the inability of DOC staff to unlock one of the committee's cell doors during the March 2004 drill. She requested his immediate attention to the problem. Plaintiff Hysler reminded defendant Brown that it was her fourth letter requesting he remedy this dangerous situation.

69. On June 15, 2004, as a result of a complaint lodged by the Essex County Public Defender's Office, Arthur W. Fucetola, Jr, the Chief Inspector/Fire Official for Kearny, New Jersey inspected the facility.

70. During this inspection, he was advised by DOC Sgt. Frank Slattery that the electronic security door system does not work. Fucetola issued a notice of violation to repair or replace the system.

71. Fucetola also determined that the automatic smoke alarms and sprinkler system were not functioning. A notice of violation was issued to repair and test these systems.

72. An additional violation was issued to test the ventilation system which reverses into an

exhaust mode upon the sounding of a fire alarm.

73. Fucetola's inspection apparently had no impact on the DOC. Between June 18, 2004 and March 2005, the fire alarms sounded at least 78 times at their typical ear-deafening decibel level. The alarms were not activated as the result of an actual fire or drill.

74. The fire alarm system continues to malfunction and the electronic door security system has not been repaired. In the event of a real fire, committees will be trapped in their cells until each door is unlocked manually. Even if released, committees would likely remain at risk because the NRU yard is too small to accommodate the nearly 200 residents and staff who would need to be evacuated.

75. Plaintiff Moore has been denied access to sufficient drinking water. The tap water at the NRU both smells and tastes foul. He has serious concerns regarding contamination, because of the water's odor as well as skin rashes and cysts he and other residents have developed since their commitment to the facility.

76. Plaintiff Moore's purchase of bottled water is limited to 24-16 ounce bottles every two weeks. Despite consistently ordering this quantity, he frequently receives a smaller number or none. Even when he is permitted to purchase 24 bottles, it is far less water than universally recommended by health officials.

77. Plaintiff Hysler has brought this health concern to the attention of Acting Governor Codey in her November 30, 2004 letter.

78. Residents of the facility, including plaintiff Moore, are frequently without toilet paper.

79. On diverse dates over the duration of plaintiff Moore's detention, DOC staff have refused his requests for toilet paper for periods of time exceeding five days.

80.   DOC staff have arbitrarily limited plaintiff Moore's purchase of toilet paper.

81.   On diverse dates over the duration of plaintiff Moore's detention, DOC staff have taken toilet paper from plaintiff Moore, having determined two rolls per month is sufficient.

82.   The facility's ventilation system blows air that smells of burning chemicals.

83.   The facility has been without electrical power for extended periods of time on diverse dates, including but not limited to the following:

      a.   April 25, 2004, between 7:00 p.m. and 10:00 p.m.

      b.   April 26, 2004, all day

      c.   June 11, 2004-June 12, 2004, most of day and evening

      d.   June 14, 2004, most of day

84.   Power outages due to blown fuses occur weekly, and water drips from light fixtures.

85.   Plaintiff Moore has a substantive due process right to safe conditions of confinement.

86.   Defendants Brown, Rogers, John Does 1-10 and Jane Does 1-10 ("DOC defendants") failed to exercise professional judgment by their failure to respond to the aforementioned dangerous conditions of which they had actual notice.

87.   Defendants Davy, Kaufman, Ferguson, John Does 11-20 and Jane Does 11-20 ("DHS/DMHS defendants"), to the extent they have had actual notice of these unsafe conditions, have failed to notify state or local health officials, or seek remedial action from their own department in violation of their duty as public officials.

88.   To the extent any of the DOC defendants lacked actual notice, they failed to exercise professional judgment by not acting in a manner which avails them of that notice.

89.   The DOC and the DHS/DMHS defendants were acting under color of law, pursuant to

O:\Moore,Wm\1983\complaint.wpd                                16

official policy and the customs, practices and usages of the State of New Jersey.

90.   The polices, practices and unsafe conditions of confinement deprive plaintiff Moore of his right to safe conditions of confinement guaranteed him under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

91.   The polices, practices and unsafe conditions of confinement deprive plaintiff Moore of his rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment.

92.   As a direct and proximate result of the aforementioned practices of defendants and the conditions of confinement at the Northern Regional Unit, plaintiff Moore has suffered a massive and continuing violation of his civil rights.   Plaintiff Moore has no adequate remedy at law, and will continue to suffer irreparable injury unless defendants are enjoined from continuing those conditions of confinement and required to implement minimum constitutional standards of safe confinement at the Northern Regional Unit.

WHEREFORE, plaintiff Moore respectfully requests:

A.   the Court issue a judgment declaring that plaintiff Moore has a constitutional right to minimum standards of safe confinement under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; that the Northern Regional Unit does not meet constitutionally minimum standards of safe confinement; and that the constitutional rights so violated are present rights which must be respected;

B.   the Court enter a mandatory injunction, directing the DOC defendants, and their agents, employees and successors in office, to rectify the unconstitutional conditions herein, and to implement the minimum standards of safe confinement to which plaintiff Moore is constitutionally entitled;

O:\Moore,Wm\1983\complaint.wpd                    17

C. the Court appoint a Special Master with the duty and authority to oversee the initial implementation of the Court's order and injunction;

D. the Court order the defendants to pay the plaintiff's costs of this suit and attorney's fees under 42 U.S.C. § 1988;

E. and for such other relief as may be just and proper.

## COUNT 2
## Punitive Conditions of Confinement

93. Plaintiffs repeat and restate the allegations in the preceding paragraphs as if set forth at length herein.

94. The SVPA is a civil statute, which by its nature and purpose is designed to quarantine a segment of the civil population in order to provide treatment to those quarantined for their "mental abnormalities." By all legislative and executive accounts, its defined housing component is, or purports to be, a locked treatment facility. The Northern Regional Unit not only resembles a prison, it is a prison. The DOC operates the facility as a prison and treats the residents as prisoners. The residents, however, have completed their prison terms.

95. Prior to its current use, the NRU served as one of three Hudson County correctional facilities, the purpose for which it was designed. After several years of litigation, Hudson County closed all three of its detention and corrections facilities, including its tent city, and opened a new county jail adjacent to the NRU.

96. County detention facilities are designed as maximum security institutions, owing to the

temporary or intermediate nature of confinement and the lack of space for recreational and longer term programs associated with longer term facilities: the former are typically called jails; the latter, prisons. The NRU has been adapted from a jail to a prison, as more fully set forth hereafter.

97.    Two security fences surround the facility, one adorned with razor wire. In 2001, well after its designation as a "temporary" civil commitment facility, the DOC added additional bales of razor wire.

98.    The DOC operates the NRU as a maximum security institution. The complex is staffed with DOC correction officers, who were trained in that capacity.

99.    Apparently unable to escape their indoctrination, DOC staff and officers refer to and address committees as prisoners and inmates. DOC corrections officer also abuse and harass committees by calling them "perverts," "baby rapers" and "tree jumpers."

100.    All residents, including plaintiff Moore, are transported for medical treatment and court appearances in handcuffs and shackles.

101.    The DOC prioritizes institutional counts in the NRU to the detriment of all other activities, including psychological and medical treatment, visits and food preparation. These activities are cut short or suspended, so committees can return to their rooms to be counted. In true civil commitment facilities, head counts are conducted without interrupting activities. Even in state correctional facilities, medical treatment and therapy sessions continue during institutional counts.

102.    DOC correction officers attend therapy sessions, hindering the comfort level of the committees and impacting confidentiality. Even in the State's correctional facilities,

officers remain outside the room while therapy sessions take place.

103.  The facility does not have a law library, notwithstanding promises made in response to litigation dating back two years.

104.  The committees, including plaintiff Moore, are locked in their cells indiscriminately, and often without explanation.

105.  The committees are often subject to random search and utter disruption of their cells, including destruction of personal property, by DOC staff, who typically decline to state a purpose for "tossing" a cell or conducting a strip search of a resident.

106.  The Department of Corrections maintains a Special Operations Group ("SOG") to maintain discipline at facilities where inmates are considered substandard in this subject.

107.  At various times, SOG squads have entered the NRU, conducted sweeping searches, arbitrary detentions, and related intimidation tactics apparently in an effort to bring residents into a perceived line of conduct.

108.  On diverse dates over the duration of plaintiff Moore's detention, he has either observed or been made aware of severe beatings of other residents for perceived infractions, the effect of which has been to chill his exercise of basic human rights.

109.  Notwithstanding the threat of physical and psychological abuse, plaintiff Moore and other residents formed a resident committee to catalogue areas of concern, raise issues with the administration, and retain counsel if necessary to protect their rights. Such committees are common in prisons.

110.  After electing officers from the resident population, the committee attempted to meet and confer on how to proceed organizationally.

111. DOC and DHS/DMHS staffs advised the committee members they would not be permitted to congregate, and in fact DOC staff physically barred members from doing so.

112. One of the primary areas of concern for committee members, of which plaintiff Moore was secretary, was the lack of a written guide or set of regulations setting forth what the DOC and DHS/DMHS staffs deemed permissible behavior and practice.

113. After several years of operation, administrators of the NRU agreed to write a handbook setting forth its non-negotiable conditions for residents. Upon entry into the institution, residents are now given that handbook, which details a wealth of restrictions perhaps best characterized with its statement that "rights...are not absolute," despite 225 years of jurisprudence to the contrary.

114. The handbook declares that a list of punitive measures available to staff are not punishment, then proceeds to list the circumstances and infractions for which residents may find themselves denied access to their personal property, denied employment, denied therapy, denied visits, or denied any other item or service it describes as a "privilege."

115. This so-called "Modified Activities Program" ("MAP") replaced the previous nomenclature of "Restricted Activities Program" ("RAP"), which was apparently disfavored as too punitive a moniker. The MAP program permits the DOC and DHS/DMHS staffs to revoke personal property and liberty rights if staff believes a resident's behavior does not conform to an ill-defined norm, including inadequate or inappropriate conduct in therapy. There is no hearing, review or other due process avenue to challenge such sanctions.

116.  In addition to the restrictions placed on residents, defendants place severe restrictions on visitors and family of the residents, with concomitant impact on both resident and his correspondent.

117.  Incoming mail to any resident is opened and inspected outside the resident's presence.

118.  In person visitation is permitted only three days per week.

119.  Personal physicians and psychologists are not permitted entry except for limited purposes of independent evaluation.

120.  Physicians and attorneys for residents are not permitted to inspect medical or related records except upon separately scheduled appointment, necessitating considerable additional expense to the resident and his family.

121.  All visitors are subject to body and parcel search prior to entry into the facility, and the visits themselves are severely restricted in terms of both time and privacy, often hampering counsel's ability to confer with a client, or a family member to share any private information without being eavesdropped by corrections officers in close proximity to the visits themselves.

122.  The telephones used by residents are equipped with interception devices, allowing staff to eavesdrop on any conversation between a resident and another person, presumably excluding his doctor or lawyer. Telephone conversations are frequently cut off without notice by staff, who also have the ability to disconnect calls.

123.  Visitors attempting to bring food or personal property to residents are restricted as to the quantity or type of food product to be allowed into the facility, and inspections of those packages often result in removal or confiscation and conversion of certain items.

124. Because commitment under the SVPA is civil and not criminal in nature, plaintiff Moore has a substantive due process right to be free from punishment. Plaintiff Moore has a corollary right to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.

125. The punitive nature of plaintiff Moore's confinement does not bear a reasonable relation to the purpose for which he was committed.

126. Because the conditions of confinement are identical or similar to, and in some instances more restrictive than, those in which criminals are held, plaintiff Moore is being subjected to punishment.

127. To the extent these conditions serve an alternative, non-punitive purpose (such as security or effective management of the facility), they are nonetheless excessive in relation to the alternative purpose.

128. In subjecting plaintiff Moore to these punitive conditions of confinement, all named defendants were acting under color of law, pursuant to official policy and the customs, practices and usages of the State of New Jersey.

129. The polices, practices and conditions of confinement deprive plaintiff Moore of his right to be free from punishment guaranteed him under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

130. The polices, practices and conditions of confinement deprive plaintiff Moore of his rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment.

131. As a direct and proximate result of the aforementioned practices of defendants and the punitive conditions of confinement at the Northern Regional Unit, plaintiff Moore has

suffered a massive violation of his civil rights.  Plaintiff Moore has no adequate remedy at law, and will continue to suffer irreparable injury unless defendants are enjoined from continuing those conditions of confinement.

WHEREFORE, plaintiff Moore respectfully requests:

A.  the Court issue a judgment declaring that plaintiff Moore has a constitutional right to non-punitive conditions of confinement under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; that the conditions of confinement in which plaintiff Moore is being held at the Northern Regional Unit constitute punishment; and that the constitutional rights so violated are present rights which must be respected;

B.  the Court enter a mandatory injunction, directing the defendants, and their agents, employees and successors in office, to rectify the unconstitutional conditions herein;

C.  the Court appoint a Special Master with the duty and authority to oversee the initial implementation of the Court's order and injunction;

D.  the Court order the defendants to pay the plaintiff's costs of this suit and attorney's fees under 42 U.S.C. § 1988;

E.  and for such other relief as may be just and proper.


### COUNT 3
#### Failure to provide adequate treatment

132.    Plaintiffs repeat and restate the allegations in the preceding paragraphs as if set forth at length herein.

133. In connection with plaintiff Moore's civil commitment and first annual review hearing under the SVPA, Jennifer Kelly, Ph.D, a psychologist then employed at the Northern Regional Unit and Gregory W. Joseph, Psy.D., the psychologist retained by plaintiff Moore administered psychological testing to determine his likelihood of re-offending, these test include the MnSOST-R and the STATIC-99.

134. MnSOST-R (Minnesota Sex Offender Screening Tool) is considered the most accurate actuarial scale used to identify which sex offenders present the greatest risk to re-offend. The tests suggests commitment for those scoring at +13 or higher. The State of New Jersey uses a lower cut off score of +8, despite empirical data demonstrating a 56% false positive rate, resulting in the commitment of persons who would not re-offend.

135. Plaintiff Moore scored +2 (low risk category) when Dr. Kelly administered the MnSOST-R on June 27, 2000. Plaintiff Moore scored -1 (low risk category) when Dr. Joseph administered the MnSOST-R on April 20, 2001.

136. The STATIC-99 is another prediction instrument to determine the risk of re-offending. The test classifies offenders into four categories: low, medium-low, medium-high and high.

137. Drs. Kelly and Joseph both scored plaintiff Moore at a level 2, placing him the "medium-low" risk category.

138. Despite a STATIC-99 "medium-low" risk category and MnSOST-R test scores significantly lower than either cut off number, in the netherworld of the SVPA commitment proceedings, plaintiff Moore was involuntarily committed now nearly five years ago.

139. The SVPA and similar statutes in other states have survived constitutional challenges based on the Ex Post Facto Clause and the Double Jeopardy Clause, because of their avowedly civil purpose of treatment.

140. Treatment at the Northern Regional Unit consists primarily of "process groups."

141. The facility does not offer individual or one-on-one therapy for residents, even upon request.

142. The extent of the group therapy offered is approximately 1 ½ - 3 hours per week, without taking into account interruptions for count or random lock down periods.

143. Although only a meager number of committees have been released, residents will not be considered for release without having participated in the process group therapy.

144. Although the SVPA delegates the responsibility for treatment to the DHS/DMHS and its employees, DOC correction officers are present during the treatment groups.

145. Plaintiff Moore does not participate in the process group, because the therapy advocates behaviors such as homosexuality, masturbation and sex outside of marriage which are contrary to his religious beliefs.

146. In 1994, plaintiff Moore accepted Jesus Christ into his life as his spiritual savior. He was, in the parlance of Christian practitioners, "born again."

147. Thereafter, Mr. Moore embarked on a course of study consistent with his fervently held religious convictions. He read Scripture, studied related texts to assist his understanding of the Old and New Testaments, and, while still incarcerated, began a relationship with plaintiff Hysler, another member of his church equally dedicated to his spiritual salvation. The two spoke and wrote repeatedly, prayed together, and agreed he should not participate

O:\Moore,Wm\1983\complaint.wpd                 26

in therapeutic techniques they considered sacrilegious.

148. On diverse dates over the duration of plaintiff Moore's detention, he has requested the State provide him with a therapist who shares his religious values, if not his precise denomination. Plaintiff Moore has requested treatment that does not contravene his religious beliefs.

149. Experts for the State agree that Christian therapists are licensed in New Jersey, that in-patient facilities around the country specialize in such faith-based treatment, and that many of the same treatment regimens apply to both Christian and non-Christian therapy.

150. Nevertheless, the treatment team at the Northern Regional Unit originally denied plaintiff Moore's request, concluding that he was either insincere in his religious beliefs, or that his refusal to submit to their form of treatment is evidence of ongoing denial of his past psycho-pathology.

151. Treatment staff have denigrated his religious beliefs by labeling him a malingerer, and have ridiculed his religion. For example, members of the treatment staff cackled loudly while observing testimony regarding the tenets of his born again faith during plaintiff Moore's annual review hearing.

152. More recently, plaintiff Moore's request for Christian-based therapy was granted, but only if he paid all of the costs of such therapy.

153. Plaintiff Moore also agreed to receive treatment by attending the "Treatment Refusal" group upon its inception on May 26, 2004.

154. The "Treatment Refusal" group consists of plaintiff Moore, another resident and three treatment staff members.

155.   While the group is scheduled to meet once per week for 80 minutes, frequently the sessions do not take place, because the treatment staff do not show up. The following include, but are not limited to, scheduled group sessions in which no treatment staff attended, resulting in no treatment for the given week:

   a.   May, 26, 2004

   b.   June 23, 2004

   c.   June 30, 2004

   d.   July 14, 2004

   e.   July 28, 2004

   f.   August 18, 2004

   g.   September 8, 2004

   h.   November 3, 2004

   i.   November 17, 2004

   j.   December 8, 2004

   k.   December 29, 2004

   l.   January 26, 2005

   m.   February 2, 2005

   n.   March 9, 2005

156.   When treatment staff does not show up, the group session is not rescheduled. As a result, there are weeks without any therapy to plaintiff Moore. In other words, plaintiff Moore continues to be confined without any progress (as defined by the treatment staff) toward recovery and eventual release.

157. Because of the defendants' failure to provide plaintiff Moore with any meaningful treatment consistent with his religious beliefs and their requirement he participate in treatment to be considered for release, the duration of plaintiff Moore's commitment is seemingly infinite.

158. Plaintiff Moore has a substantive due process right to adequate treatment consistent with the SVPA's avowedly civil purpose.

159. This right to treatment includes a right to individualized treatment efficacy, that is a realistic opportunity to be cured or improve the mental condition for which he is confined.

160. Defendants Davy, Kaufman, Ferguson, Main, John Does 11-20, Jane Does 11-20 ("DHS and DMHS" defendants), John Does 21-30 and Jane Does 21-30 ("Oversight Board Member" defendants) have an affirmative obligation to enhance plaintiff Moore's liberty interests through the provision of treatment that enables him to recover sufficiently to enjoy post-commitment liberty.

161. DHS, DMHS and Oversight Board Member defendants have failed to provide plaintiff Moore with adequate treatment and individualized treatment efficacy.

162. In so doing, these defendants were acting under color of law, pursuant to official policy and the customs, practices and usages of the State of New Jersey.

163. The polices and practices resulting in a lack of treatment deprive plaintiff Moore of his right to adequate treatment and individualized treatment efficacy guaranteed under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

164. The polices and practices resulting in a lack of treatment deprive plaintiff Moore of his rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment.

165. As a direct and proximate result of the aforementioned practices of the DHS, DMHS and Oversight Board Member defendants, plaintiff Moore has suffered a massive violation of his civil rights. Plaintiff Moore has no adequate remedy at law, and will continue to suffer irreparable injury unless defendants are enjoined and required to implement minimum constitutional standards of adequate treatment for plaintiff Moore.

WHEREFORE, plaintiff Moore respectfully requests:

A. the Court issue a judgment declaring that plaintiff Moore has a constitutional right to adequate treatment and individualized treatment efficacy under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; that the treatment being offered presently does not meet minimum constitutional standards; and that the constitutional rights so violated are present rights which must be respected;

B. the Court enter a mandatory injunction, directing the defendants, and their agents, employees and successors in office, to rectify the unconstitutional conditions herein;

C. the Court appoint a Special Master with the duty and authority to oversee the initial implementation of the Court's order and injunction;

D. the Court order the defendants to pay the plaintiff's costs of this suit and attorney's fees under 42 U.S.C. § 1988;

E. and for such other relief as may be just and proper.

## COUNT 4
### Violation of Free Exercise Clause

166. Plaintiffs repeat and restate the allegations in the preceding paragraphs as if set forth at length herein.

O:\Moore,Wm\1983\complaint.wpd                    30

167. Plaintiff Moore has a First Amendment right to freely exercise his religion. This right prohibits the government from interfering with his religious beliefs by coercing him to affirm beliefs repugnant to his religion and from penalizing him for holding beliefs contrary to the beliefs of others.

168. DHS. DMHS and Oversight Board Member defendants have failed to provide plaintiff Moore with any meaningful treatment that does not violate his religious beliefs.

169. DHS and DMHS policy requires plaintiff Moore's participation in treatment before considering him for release from confinement.

170. By requiring plaintiff Moore to participate in the process group which advocates beliefs repugnant to his religion and making his participation a prerequisite to release from confinement, DHS, DMHS and Oversight Board Member defendants are depriving plaintiff Moore of his rights under the Free Exercise Clause of the First Amendment and Fourteenth Amendment of the United States Constitution and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc.

171. By requiring plaintiff Moore to pay for Christian-based treatment and making treatment a prerequisite to release from confinement, DHS, DMHS and Oversight Board Member defendants are depriving plaintiff Moore of his rights under the Free Exercise Clause of the First Amendment and Fourteenth Amendment of the United States Constitution and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc.

172. In so doing, these defendants were acting under color of law, pursuant to official policy and the customs, practices and usages of the State of New Jersey.

173. As a direct and proximate result of the aforementioned practices of the DHS, DMHS and

Oversight Board Member defendants, plaintiff Moore has suffered a massive violation of his civil rights. Plaintiff Moore has no adequate remedy at law, and will continue to suffer irreparable injury unless defendants are enjoined and required to provide treatment for plaintiff Moore consistent with his religious beliefs.

WHEREFORE, plaintiff Moore respectfully requests:

A. the Court issue a judgment declaring that plaintiff Moore has a constitutional right to exercise his religion freely without penalty under the Free Exercise Clause of the First Amendment to the United States Constitution; that to require his participation in a treatment regimen that advocates beliefs repugnant to his religion or to require him to pay the costs of therapy consistent with his religion where his participation in treatment is a prerequisite to his release from confinement violates the Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act; and that the constitutional rights so violated are present rights which must be respected;

B. the Court enter a mandatory injunction, directing the defendants, and their agents, employees and successors in office, to rectify the unconstitutional conditions herein;

C. the Court appoint a Special Master with the duty and authority to oversee the initial implementation of the Court's order and injunction;

D. the Court order the defendants to pay the plaintiff's costs of this suit and attorney's fees under 42 U.S.C. § 1988;

E. and for such other relief as may be just and proper.

## COUNT 5
### Violation of Right to Marry

174. Plaintiffs repeat and restate the allegations in the preceding paragraphs as if set forth at length herein.

175. On November 4, 2000, plaintiffs became engaged to be married.

176. Prior to scheduling or attempting to arrange a wedding ceremony, plaintiffs learned from third parties of a process required to obtain permission to marry from staff at the NRU.

177. After several inquiries, plaintiffs were able to schedule an interview of plaintiff Hysler, who was compelled to meet with approximately six staff members at NRU.

178. The meeting itself was scheduled in February, 2001, to be held at the NRU.

179. As a result of an approximately 20 minute interview, during which plaintiff Hysler submitted to a series of degrading questions and comments, a staff "committee" took her request to marry under advisement.

180. After several inquiries, plaintiff Moore was advised by staff in or about April, 2001, that plaintiffs' request to marry had been denied without explanation.

181. `In subsequent years, plaintiff Hysler has learned of other residents being permitted to marry, and upon information and belief, there is a protocol in place where approval has been given.

182. Plaintiffs have never been told why permission was denied, nor have they been advised that the position of staff may have changed, and defendants' denial of permission to marry continues to this day.

183.   Plaintiffs have a right to marry as part of the fundamental right of privacy implicit in the Fourteenth Amendment's Due Process Clause.

184.   By requiring plaintiffs to submit to an interview and arbitrary approval process in order to get permission to marry, DHS and DMHS defendants are depriving plaintiffs of their fundamental right to marry guaranteed under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

185.   In so doing, these defendants were acting under color of law, pursuant to official policy and the customs, practices and usages of the State of New Jersey.

186.   As a direct and proximate result of the aforementioned practices of the DHS and DMHS defendants, plaintiffs have suffered a massive violation of their civil rights.  Plaintiffs have no adequate remedy at law, and will continue to suffer irreparable injury unless defendants are enjoined and required to allow plaintiffs to marry.

WHEREFORE, plaintiffs Moore and Hysler respectfully request:

A.  the Court issue a judgment declaring that plaintiffs have a constitutional right to marry, freely without penalty under the Fourteenth Amendment to the United States Constitution; that defendants do not have authority to grant or deny permission for any resident to marry, subject to conditions consistent with the proper running of the institution; and that the constitutional rights so violated are present rights which must be respected;

B.  the Court enter a mandatory injunction, directing the defendants, and their agents, employees and successors in office, to rectify the unconstitutional conditions herein;

C.  the Court appoint a Special Master with the duty and authority to oversee the initial implementation of the Court's order and injunction;

O:\Moore,Wm\1983\complaint.wpd                          34

D. the Court order the defendants to pay the plaintiff's costs of this suit and attorney's fees under 42 U.S.C. § 1988;

E. and for such other relief as may be just and proper.

FURLONG AND KRASNY
Attorneys for Plaintiffs

By: _____

John S. Furlong

Dated:  04/21/05